UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Elyssa B. Slater

v.                                  Civil No. 07-cv-407-JL
                                    Opinion No. 2009 DNH 029
Town of Exeter
and Richard Kane


**O R D E R**

The defendants, the Town of Exeter and its Chief of Police,
Richard Kane, move for summary judgment on claims by the
plaintiff, Elyssa B. Slater, the Town's former police prosecutor.
Slater claims sex discrimination and retaliation in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-
2(a)(1), 2000-e-3(a), and its state-law analog, N.H. Rev. Stat.
Ann. §§ 354-A:7, I, 354-A:19, as well as her rights to equal
protection and procedural due process under the federal
constitution, and common-law breach of contract and intentional
interference with contractual relations.  Among other things, the
defendants argue that, as a matter of law, Slater cannot show any
adverse employment action, including a constructive discharge,
sufficient to support any of her claims.

The court has jurisdiction over this matter under 28 U.S.C.
§§ 1331 (federal question) and 1367 (supplemental jurisdiction).

After hearing oral argument, and for the foregoing reasons, the court grants the motion for summary judgment.

## I.   **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  This rule "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . , since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 320 (1986).  In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  The following background facts are set forth in accordance with this standard.

## II.  **Background**

In May 2006, following her graduation from law school, Slater began working for the Town as its police prosecutor.  She was hired based in part on Chief Kane's recommendation.  The police prosecutor job was a full-time, salaried position, i.e., the pay did not depend on how many hours were worked.  Slater was nevertheless required to keep track of those hours by punching in and out on a time clock.  The two employees who had held the police prosecutor job immediately prior to her--one woman and one man--had also been required to use the clock, but, unlike Slater, they were part-time employees paid by the hour.  Slater was informed of this requirement when she commenced her employment, and made no complaint.

Slater alleges, however, that her supervisor, Lieutenant Christopher Fenerty, soon ordered that she in fact work forty hours each week, during regular business hours.  She further alleges that Fenerty "closely monitored" her compliance with the forty-hour minimum, demanding that she give advance notice of her absences and that she make up any time she missed.  Slater contrasts this treatment with that of other full-time employees of the Town's police department, all of whom were male.[1]

---

[1]Slater also recounts two other instances of perceived disparate treatment on account of her sex.  In the first, Kane

3

Kane, for his part, says that he merely "requested that Ms. Slater try to work approximately a 40 hour work week during regular business hours" to justify the Town's decision to hire her as its first full-time police prosecutor.  But Slater maintains that this rationale was never communicated to her.  In fact, Slater recalls, after repeatedly complaining to Lt. Fenerty in fall 2006 about the perceived disparate treatment, Fenerty conveyed Kane's explanation that Slater needed to use the time clock because "the prosecutor always has."  Fenerty also invited Slater to discuss the matter directly with Kane.

In preparation for this discussion, Slater spoke to the Town's director of human resources, Julie Lund, who expressed her belief that none of the Town's salaried employees was required to

---

instructed her to park across the street from her office in a municipal parking lot used by the police department's "non-salaried secretarial staff, all of whom are female," while the department's salaried employees, all of whom were male, were allowed to park right outside the station.  Chief Kane explains that he had simply allocated that parking, which was at a premium, to "emergency vehicles and personnel," namely, the department's sworn officers as opposed to its civilian employees like Slater.  In the second instance of perceived disparate treatment, Lt. Fenerty told Slater to use what she describes as "a previously damaged and salvaged Toyota" to travel to and from court, while her male predecessor had been offered the use of a police cruiser for that purpose.  Kane does not deny this, but explains that Slater never complained about having to use the Toyota, which was also regularly used by officers "for business-related travel and for undercover operations."  It is undisputed, in fact, that Slater never complained about either of these instances while she was working for the Town.

4

use the time clock.  Lund confirmed this by checking with the Town Manager, who suggested that Lund "check with Chief Kane on this, [as] it could simply be an oversight."  Lund relayed to Slater that the Town Manager knew of no specific reason for Slater to be using the time clock.  Slater also located a copy of the Town's standard operating procedure on "Time Cards/Hours Worked," which, by its terms, imposed time-keeping requirements on "hourly and part-time employees only."[2]

Armed with this information, Slater spoke to Lt. Fenerty again on February 23, 2007, inquiring why she was required to use the time clock when the Town's other salaried employees were not and, as she puts it, "express[ing] concern that I was being discriminated against either because I am a woman or because I am young."  In response, Slater recalls, Fenerty discouraged her from raising that concern with Chief Kane, adding that she should "pick and choose her battles," "watch [her] demeanor," and "not use words like 'grievance'" if she chose to speak to Kane about the matter.  Fenerty, who disputes parts of this account, nevertheless agreed to arrange a meeting between Slater and Kane.

---

[2] The policy also requires, however, "full-time employees to be on the job for eight (8) hours (normal work schedule)," exclusive of lunch breaks.

Slater acknowledges that she had not previously had any problems with either Fenerty or Kane.

Later that afternoon, Slater recalls, Chief Kane "stormed into my office and slammed the door behind him.  He then accosted me in a loud voice and in an aggressive matter.  He kept yelling 'You want to speak with me?'"  After she started to explain her concern over having to use the time clock, Slater says, Kane claimed that she had agreed to do so, which she denied, then asked whether she would have a problem with the practice if it were extended to all employees, to which she said no.  Kane also demanded to know whether Slater intended to file a grievance with the Town Manager, whom--to Kane's clear displeasure--had already become involved as a result of Slater's inquires to the Town's director of human resources.

Slater adds that when she asked Chief Kane to stop yelling, he did so but "adopted a mocking and sarcastic tone."  When Slater's cell phone rang at one point, Kane threatened to "take it from [her] and throw it out the window."  Jabbing his finger at Slater, Kane called her a "petty woman," and accused her of lacking gratitude "for all he had done for [her]."  Kane further complained--for the first time, according to Slater--about her job performance, and in particular, her allegedly excessive use of sick time.  Kane questioned whether Slater had in fact been

too sick to work on those occasions, which she took as an affront to her integrity.[3]  According to Slater, Kane also "told me directly that I should be concerned about my job."

Chief Kane also predicted that "he would 'win,'" citing to an example of a former police officer for the Town who had been terminated and over whom Kane had shown an "obsession" with having decertified.  Slater recalls that:

> by [Kane's] demeanor and in the context of his other comments, I could tell that he would engage in similar retribution by making my life miserable and by tormenting me.  I knew from [his] statement and the manner on which he delivered them [*sic*] that I had crossed the line with him.  I knew that he was either going to terminate my employment either directly or by making things so difficult I could not continue to stay.

Kane also told her, however, "that once I had been employed for a full year that he would no longer require me to punch the timecard"--at that point, she had been employed for less than ten months.  And Slater says that she "reluctantly agreed as I felt intimidated and it seemed as if I had no choice."

But on the next night, which was a Saturday, Slater went to the police department to retrieve her personal belongings from her office.  On the coming Monday, she went to the town hall to report her confrontation with Kane to Lund, the human resources

---

[3]Slater points out that, at the time of this confrontation, she had used less than one-third of her accrued sick time.

director.  Lund summoned the Town Manager, who said he was too busy to talk with Slater that day.  Slater submitted a letter of resignation to Lund that day, though it is unclear whether she did this before or after she had spoken with the Town Manager.

Slater never did file a grievance against Chief Kane; she points out the Town's employee grievance policy does not apply to complaints for violations of its anti-harassment policy, which includes a prohibition on sex discrimination.  She also points out that the Town's personnel plan allows it to "dismiss any employee for inefficiency or incapacity, insubordination, offenses against the law or other similar just cause," and that "[s]uch action shall be in accordance with the provisions of [the plan] and Due Process."  The Town acknowledges that Slater had the benefit of these protections by virtue of her elevation from probationary to permanent employment status in November 2006, though there is no direct evidence that she was aware of this at any time prior to her resignation.[4]

Slater reports that, in the wake of her confrontation with Kane, she experienced trouble sleeping and other distress.  She was eventually diagnosed as suffering from anxiety and

---

[4]At oral argument, counsel for Chief Kane argued forcefully that the circumstantial evidence in the summary judgment record supports a finding that Slater was in fact aware of these protections at that time.

depression, and prescribed drugs to treat those conditions.  In due course, Slater filed a charge of discrimination against the Town with the New Hampshire Human Rights Commission.  After receiving a notice of her right to sue, Slater brought this suit.

### III. **Analysis**

Slater's complaint asserts eight numbered counts:

- gender discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) against the Town (Count 1);

- retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a) against the Town (Count 2);

- gender discrimination in violation of the New Hampshire Law Against Discrimination, N.H. Rev. Stat. Ann. § 354-A:7, I against the Town (Count 3);

- retaliation in violation of the New Hampshire Law Against Discrimination, N.H. Rev. Stat. Ann. § 354-A:19 against the Town (Count 4);

- violation of her right to equal protection under the federal Constitution against the Town and Kane (Count 5);

- breach of her employment contract against the Town (Count 6);

- violation of her right to procedural due process under the federal constitution against the Town and Kane (Count 7); and

- "intentional interference with contractual and economic relations" against Kane (Count 8).

The defendants have moved for summary judgment on all of these claims, raising a variety of arguments.  These include, as noted

above, that Slater cannot show the materially adverse employment
action necessary to recover on any of her claims, because she
voluntarily resigned from her job.  Slater, in response, argues
that she has come forward with sufficient proof for a jury to
find that (1) having to use the time clock amounted to an adverse
employment action, (2) she did not willingly resign, but was
constructively discharged, and (3) even if her treatment did not
rise to the level of constructive discharge, it nevertheless
amounted to actionable retaliation.  The court will discuss these
arguments in turn.


**A.    Employment Discrimination/Equal Protection**

     Title VII bans employment practices that "discriminate
against any individual with respect to his . . . compensation,
terms, conditions, or privileges of employment, because of such
individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  The New
Hampshire Law Against Discrimination contains a prohibition that
is identical in all relevant respects.  N.H. Rev. Stat. Ann.
§ 354-A:7, I.  The "terms, conditions, or privileges of
employment" language of these provisions "encompasses a variety
of adverse employment actions, including demotions,
disadvantageous transfers or assignments, refusals to promote,
unwarranted negative job evaluations, and toleration of

harassment by other employees." <u>Hernandez-Torres v. Intercont'l Trading, Inc.</u>, 158 F.3d 43, 47 (1st Cir. 1998); <u>accord</u> <u>Madeja v. MPB Corp.</u>, 149 N.H. 371, 380 (2003) (adopting First Circuit's view that "actions falling short of ultimate employment decisions . . . may constitute adverse employment actions" under RSA 354-A).[5]  The language, as it appears in these statutes and analogous employment discrimination laws, also encompasses a "constructive discharge." <u>See</u>, <u>e.g.</u>, <u>Suarez v. Pueblo Int'l, Inc.</u>, 229 F.3d 49, 54 (1st Cir. 2000).

Slater argues that, her alleged constructive discharge aside, she experienced discrimination in the terms, conditions, or privileges of her employment which caused her to complain to Kane in the first place.  But that complained-of treatment, <u>viz.</u>, having to punch a time clock (alone or in conjunction with having to work at least forty hours a week during business hours) was only "the kind of 'petty slights or minor annoyances that often take place at work and that all employees experience' and that,

---

[5]As this court has observed, "the New Hampshire Supreme Court relies on federal case law developed under Title VII in analyzing claims under chapter 354-A." <u>Dolan v. SunGard Secs. Fin., LLC</u>, 2008 DNH 085, 4 n.1 (citing <u>Madeja</u>, 149 N.H. at 378). Yet, as the court's discussion at Part III.B <u>infra</u> demonstrates, this does not foreclose the possibility that the state supreme court might interpret certain provisions of RSA 345-A more broadly than its state-law analog.  <u>Cf.</u> <u>Madeja</u>, 149 N.H. at 379 (calling "federal law developed under Title VII instructive," rather than "controlling").

consequently, fall outside the scope of the anti-discrimination laws."[6]  Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Slater argues that making her account for her time by using the time clock amounted to actionable "[d]isparate treatment on the basis of gender in the assignment of professional respect."[7]

---

[6]Slater does not characterize having to park across the street from her office or drive the salvaged Toyota, see note 1, supra, as materially affecting her employment--only as evidence of the defendants' alleged discriminatory animus.  In any event, those deprivations also did not rise to the level of adverse employment actions, either individually or in conjunction with having to account for her time on the clock.

[7]In support of this argument, Slater relies on 4 Joseph G. Cook & John L. Sobieski, Jr., Civil Rights Actions § 21.22[C][2], at 21-363--21-364 (1992 & 2008 supp.), but that treatise does not support her view.  Cook and Sobieski discuss a law review article arguing that an employee's exclusion from certain social activities, e.g., "'golfing with the boss or having lunch with the supervisor,'" should count as adverse action under Title VII because they often "bear directly upon an employee's assignments, working conditions, raises and promotion."  Id. at (quoting Theresa M. Beiner, Do Reindeer Games Count as Terms, Conditions, or Privileges of Employment Under Title VII?, 37 B.C. L. Rev. 643, 645 (1996)).  The question raised by the title of this article has been answered, in large part, by the Supreme Court's decision in Burlington Northern, which observed that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement" could amount to an adverse action, at least under Title VII's anti-retaliation provision.  548 U.S. at 69.  Because Slater does not allege that having to account for her time by using the clock hindered her "professional advancement"--and it is difficult to imagine how it could have--this theory is wholly inapposite here.

A lack of "respect," however, does not equate with an adverse employment action.  See, e.g., Marrero v. Goya of P.R., Inc., 304 F.3d 7, 25 (1st Cir. 2002); Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 36 (1st Cir. 2001).  Indeed, that is true even when the disrespect is occasioned by some tangible job action, such as a lateral transfer, see id., and Slater experienced nothing like that.  Cf. Billings, 515 F.3d at 54 (ruling that a lateral transfer to a job with the same pay and benefits, but with less prestige because of a lower ranked supervisor, less contact with elected officials and members of the public, and lower requirements, could constitute an adverse employment action).

What Slater did experience before her confrontation with Chief Kane was not, as a matter of law, an adverse employment action under Title VII or RSA 354-A:7.  See, e.g., Marrero, 304 F.3d at 25 (ruling that supervisors' "extreme supervision" of plaintiff was not adverse as a matter of law).  Furthermore, because the court of appeals generally applies the same standard both to equal protection and Title VII claims arising out of public employment, see Lipsett v. Univ. of P.R., 864 F.2d 881, 896 (1st Cir. 1988), Slater's failure to create a genuine issue as to any adverse employment action supporting her employment

discrimination claims is likewise fatal to her equal protection claim, see, e.g., Mitchell v. Pope, 189 Fed. Appx. 911, 913-14 & n.2 (11th Cir. 2006) (unpublished disposition).  The defendants are entitled to summary judgment on those claims.


**B.    Constructive Discharge**

Slater also claims that, when she complained about the perceived disparate treatment, she was subjected to a constructive discharge in violation of the anti-retaliation provisions of both Title VII and RSA 354-A, as well as her constitutional rights to procedural due process and at common law.  Though the court has ruled, as a matter of law, that the complained-of treatment did not rise to the level of actionable employment discrimination, that ruling does not make that treatment irrelevant to the constructive discharge question, that is, whether Slater's "working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." Torrech-Hernandez, 519 F.3d at 50 (internal quotation marks omitted).  Due to the essentially trivial nature of having to account for one's time by punching a clock, however, that requirement does not add much to her constructive discharge claim, for which "[i]t is not enough that a plaintiff suffered 'the ordinary slings and arrows that workers

14

routinely encounter in a hard, cold world.'"   <u>Lee-Crespo v.</u>
<u>Schering-Plough Del Caribe Inc.</u>, 354 F.3d 34, 45-46 (1st Cir.
2003) (quoting <u>Suarez</u>, 229 F.3d at 54).

 Because the constructive discharge theory essentially treats
"a seemingly voluntary resignation [as] a termination," it
requires a plaintiff to show not only that "'working conditions
. . . were difficult or unpleasant,'" but that "'his employer did
not allow him the opportunity to make a free choice regarding his
employment relationship.  Thus, in order for a resignation to
constitute a constructive discharge, it effectively must be void
of choice or free will." <u>Torrech-Hernandez v. Gen. Elec. Co.</u>,
519 F.3d 41, 50 (1st Cir. 2008) (quoting <u>Exum v. U.S. Olympic</u>
<u>Comm.</u>, 389 F.3d 1130, 1135 (10th Cir. 2004)).  And "[t]he
standard for addressing a constructive discharge claim 'is an
objective one:  it cannot be triggered solely by the employee's
subjective beliefs, no matter how sincerely held.'"   <u>Id.</u> (quoting
<u>Marrero</u>, 304 F.3d at 28).

 Slater argues that the confrontation by Kane created a
constructive discharge because "a reasonable employee standing in
[her] shoes would have believed that [her] termination was
imminent." <u>Torrech-Hernandez</u>, 519 F.3d at 51.  Employment law
recognizes this theory, protecting "the employee who 'decides to
quit rather than wait around to be fired,'" <u>id.</u> (quoting <u>Bragg v.</u>

Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998).
The theory is a narrow one:  "apprehension of future termination
is insufficient to establish constructive discharge--instead, an
employee 'is obliged not to assume the worst, and not to jump to
conclusions too fast.'"   Id. at 52 (quoting Agnew v. BASF Corp.,
286 F.3d 307, 310 (6th Cir. 2002) (further internal quotation
marks omitted)).

Slater offers little to support her constructive discharge
theory beyond her subjective belief that Kane "was going to
terminate my employment either directly or by making things so
difficult I could not continue to stay."[8]  She does not claim,
for example, that Kane asked her to quit, told her she would be
fired if she did not quit first, cf. Acrey v. Am. Sheep Indus.
Ass'n, 981 F.2d 1569, 1574 (10th Cir. 1992) (cited in Torrech-
Hernandez, 519 F.3d at 51), or threatened to fire her if she
proceeded with her complaints of disparate treatment, cf.
Henderson v. Simmons Foods, Inc., 217 F.3d 612, 615-16 (8th Cir.
2000).  According to Slater's version of the confrontation, in
fact, the closest Kane ever came to overtly threatening her

---

[8]This subjective belief--that the Chief had decided, as of
that day, to terminate her, as opposed to threatening to do so if
she persisted with workplace complaints in the future--although
rejected by the court as objectively unreasonable, is significant
to the court's analysis of her retaliation claim.  See infra Part
III, C and n. 14.

continued employment was when he "told me directly that I should be concerned about my job" in the context of criticizing her performance.  But telling an employee, in essence, to "shape up or ship out" does not amount to a constructive discharge, even if the criticism is unjustified.  See Agnew, 286 F.3d at 310 (cited in Torrech-Hernandez, 519 F.3d at 51); see also, e.g., Fischer v. Andersen Corp., 483 F.3d 553, 557 (8th Cir. 2007) (collecting cases).

Slater also suggests that Chief Kane indirectly threatened her job by mentioning "his self-described obsession with efforts to punish and decertify a former member of the police department with the obvious implication that he would engage in similar retribution toward" Slater and, similarly, asking her how she would like having her job performance "nitpicked."  Slater grounds her understanding of these remarks in Kane's "demeanor" and "manner," but "an 'employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute constructive discharge.'"  Id. at 51 (quoting Alfieri v. SYSCO Foods Servs.-Syracuse, 192 F. Supp. 2d 14, 24 (W.D.N.Y. 2001)).  In any event, even if Slater's interpretation of these comments is accepted, "[a]n employee who quits a job in

17

apprehension that conditions may deteriorate later is not constructively discharged." Agnew, 286 F.3d at 310; see also 1 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law § 20.IV.B, at 1444 (C. Geoffrey Welch, ed., 4th ed. 2007) ("even when the employee is faced with what he or she anticipates will be an intolerable job environment, courts generally hold that the employee should remain to see whether those fears in fact do materialize" before quitting) (footnote omitted).

Moreover, these comments did not occur in isolation, but in the context of an exchange that concluded with Kane's announcing that Slater would have to keep using the time clock only until she had been working for the Town for a full year, when at that point she had been working for the Town for less than ten months. No reasonable employee could think termination was imminent based on statements from her supervisor expressing an intent that she continue working there.[9]  To the contrary, "an employee who leaves his employment when he has been presented with legitimate options for continued employment with that employer . . . is

---

[9]At oral argument, the Town emphasized that, due to Slater's status as a permanent employee at that point, Kane had no authority to fire her anyway, and any firing would have been only for cause and preceded by notice and a hearing.  As noted above, however, there is no evidence that Slater knew this at that time.

precluded from claiming constructive discharge." LaPointe v.
United Autoworkers Local 600, 103 F.3d 485, 489 (6th Cir. 1996).

And there is no question that having to keep using the time
clock for another two months was a "legitimate option," given
that the practice was at most a "petty slight" or "minor
annoyance" in the first place, as just discussed.  Indeed, the
very fact that Chief Kane proposed this option undermines
Slater's theory that the inadequacy of the Town's response to her
complaints justified her resignation so as to make it a
constructive discharge.  While "the evaluation of a constructive
discharge claim takes into account how the employer responded to
the plaintiff's complaints and whether it was likely that the
harassment would continue," Lee-Crespo, 354 F.3d at 45, that
factor does not fairly support such a claim here.  By Slater's
own account, her immediate supervisor, Lt. Fenerty, was
responsive to her gripes, going to Kane for an explanation and
ultimately inviting her to speak to the chief herself.  The same
is true of the Town's director of human resources and town
manager, who promptly answered Slater's inquiries about having to
use the clock despite her full-time status.[10]

---

[10]It is true that the town manager later said he was too
busy to speak with Slater about her difficulties with Chief Kane,
but that did not occur until after Slater had already cleaned out
her office, and possibly after she had already tendered her

Though, ultimately, Chief Kane responded to news of Slater's
complaints by angrily confronting her about them, it cannot be
ignored that, at the end of that confrontation, he offered to end
the complained-of practice within two months' time.  So the
totality of the defendants' response to Slater's complaint
cannot, as a matter of law, support her theory that she
"reasonably believed that her working conditions . . . would not
change and that she could only anticipate more of the same
intolerable" treatment.  Marrero, 304 F.3d at 28-29 (upholding
verdict of constructive discharge where employer ignored
plaintiff's complaints of sexual harassment until she filed them
with the EEOC, and even then only changed her supervisor without
moving her desk away from the harasser).  Indeed, those
conditions were not "intolerable" in the first place because, as

---

resignation as well.  The town manager's response to Slater,
then, could not have factored into her decision to quit and is
therefore essentially irrelevant to the constructive discharge
question.  See Jaetzold v. Glazer's Wholesale, 199 F.3d 437 (5th
Cir. 1999) (unpublished disposition) ("post-resignation events
are not probative of the issue of whether pre-resignation work
conditions were so intolerable that a reasonable employee would
have felt compelled to resign") (footnote omitted).  The same is
true of Slater's charge that "[t]here was no prompt and effective
investigation" of Kane's alleged tirade; that is hardly
surprising given that Slater resigned within seventy-two hours.

discussed in Part III.A, supra, they did not amount to actionable employment discrimination.[11]

Slater also argues that, even if her constructive discharge claim fails under federal law, it could succeed under New Hampshire law which, she posits, "has adopted a lenient standard for constructive discharge."  Slater bases this argument on two cases, neither of which suggests a standard lenient enough to encompass her allegations.

In the first case, Porter v. City of Manchester, 151 N.H. 30 (2004), the New Hampshire Supreme Court upheld a jury's finding of constructive discharge based on the plaintiff's long series of run-ins with his supervisor.  Id. at 42.  Among other things, the supervisor made numerous comments threatening the plaintiff's firing to others; made similar comments to the plaintiff himself,

---

[11]This is in the starkest contrast to Henderson, supra, a case that Slater nevertheless calls "similar."  There, a coworker harassed the plaintiff "almost continuously from 1994 to 1995, and throughout 1997 . . . with a barrage of sexual vulgarities." 217 F.3d at 615.  "He also groped her . . . rubbed his pelvis up against her backside,"  and "shoved a broom handle into the crotch area between her legs."  Id.  Yet the employer repeatedly ignored the plaintiff's complaints, even reassigning the harasser to a station near the plaintiff's after he had been moved for an unrelated reason and threatening to fire the plaintiff; when the employer finally launched an investigation, it consisted of interviewing non-English speaking employees without the aid of an interpreter.  Id.  How that treatment is "similar" to the indignities perceived by Slater--the worst of which Kane offered to cease in a mere two months--is lost on the court.

including, "We'll see how long you last"; objected to the
plaintiff's return from a medical leave of absence; physically
prevented the plaintiff from going to the human resources
department in response to an argument between them; and,
ultimately, suspended him.  Id. at 33-36.  Here, in contrast,
Slater's allegedly objectionable treatment by Kane was limited,
by her own admission, to the one confrontation and that--unlike
the plaintiff's in Porter--included no tangible employment
action, like a suspension.  Indeed, the court in Porter
explicitly held that "[r]elatively minor abuse of an employee is
not sufficient for a constructive discharge.  Rather, the adverse
working conditions must generally be ongoing, repetitive,
pervasive, and severe."  Id. at 42 (internal quotation marks and
citation omitted).

     In Lacasse v. Spaulding Youth Center, 154 N.H. 246 (2006),
the plaintiff's supervisor yelled at her twice, once "for several
minutes," and "treated [her] gruffly" over a two-day span, then,
as part of her annual performance review, "was critical of the
plaintiff's job performance."  Id. at 247.  Putting aside the
fact that here, Slater was yelled at only once and never given a
negative review, Lacasse reversed the entry of summary judgment
for the employer on the plaintiff's constructive discharge claim
due largely to another fact absent here:  the supervisor's having

warned the plaintiff, during her job interview, that if the supervisor "comes across anything she dislikes about [an employee], she makes it miserable enough for them [*sic*] to quit, that she does not fire anyone." Id. at 249.  The court reasoned that, in light of this "threat," a "reasonable jury might find that a reasonable person in the plaintiff's position would conclude that [the supervisor] was trying to drive her out, and that the relatively short period of mistreatment was only the beginning of a campaign of abuse that would continue until she quit." Id.

The record here lacks comparable evidence of any analogous self-fulfilling prophesy.  First, because Slater quit immediately after receiving the threat, she did not experience her boss's starting to put those words into action--in contrast to both the plaintiff in Lacasse and successful constructive discharge plaintiffs in general, see 1 Lindemann & Grossman, supra, § 20.IV.B, at 1444.  Second, and more significantly, Kane's perceived threat was coupled with an expressed intention to continue employing Slater and, after two months, ceasing the objected-to practice--also in contrast to Lacasse in both the substance of the threat and the manner in which it was apparently being carried out (which, there, included a negative performance review).  Slater cannot show constructive discharge as a matter

of law under either federal or state standards.  See Costa
Precision Mfg. Corp. v. Farris, 2007 DNH 70, 6, 9-11 (ruling that
employee failed to state constructive discharge claim under New
Hampshire law despite a threat that he would be fired and would
"lose everything," because no previous threats had been made and
"nothing suggests that the threatening conduct had, in fact, been
ongoing, repetitive, pervasive, or even severe").

## C.   Retaliation

Slater also argues that, the constructive discharge standard
aside, she can show actionable retaliation under Title VII.  The
Supreme Court has indeed explained that because "Title VII's
substantive provision and its antiretaliation provision are not
co-terminus," conduct may "discriminate against [an] employee[]
. . . because he has opposed any practice made unlawful" under
Title VII, 42 U.S.C. § 2000e-3(a), even if it does not
"discriminate . . . with respect to his . . . compensation,
terms, conditions, or privileges of employment," 42 U.S.C.
§ 2000e-2(a)(1).  Burlington Northern, 548 U.S. at 67.

Nevertheless, the "antiretaliation provision protects an
individual not from all retaliation, but from retaliation that
produces an injury or harm."  Id.  So "a plaintiff must show that
a reasonable employee would have found the challenged action

24

materially adverse, which in this context means it well might
have dissuaded a reasonable worker from making or supporting a
charge of discrimination."[12]  Id. at 68 (internal quotation marks
omitted).  "[N]ormally petty slights, minor annoyances, and simple
lack of good manners will not create such deterrence."  Id.

As this standard makes clear, the manner in which Chief Kane
allegedly reacted to Slater's complaint--by confronting her with
a raised voice on one occasion--does not approach the materially
adverse employment action necessary for a retaliation claim.  A
supervisor's "upbraiding" or "criticizing" an employee for
pursuing a discrimination claim generally does not amount to
actionable retaliation as a matter of law.  Billings, 515 F.3d at
54 (ruling that defendant supervisor did not retaliate as a
matter of law by calling plaintiff into his office and accusing
her of trying to embarrass him before his superiors).  Indeed,
"[t]he Supreme Court . . . has emphasized that sporadic verbal

---

[12]The New Hampshire Supreme Court has yet to consider
whether to use the Burlington Northern standard for retaliation
claims under RSA 354-A:19.  This court will assume that the New
Hampshire Supreme Court would do so, given its usual practice of
looking to federal anti-discrimination law in interpreting New
Hampshire anti-discrimination law.  See note 5, supra.  Slater
does not argue that New Hampshire would use a test for
retaliation which is more favorable to her, and the state supreme
court, albeit in a pre-Burlington Northern decision, did not in
fact use a more favorable test, see Madeja, 149 N.H. at 378-80.

altercations or disagreements do not qualify as adverse actions
for purposes of retaliation claims." Baloch v. Kempthorne, 550
F.3d 1191, 1199 (D.C. Cir. 2008) (ruling that a boss's
"profanity-laden yelling"--including threats to have plaintiff
removed from the workplace in handcuffs--did not show actionable
retaliation, citing Burlington Northern, 548 U.S. at 68); see
also Hardage v. CBS Broad., Inc., 427 F.3d 1177, 1189 (9th Cir.
2005) (upholding summary judgment for defendant on a retaliation
claim based on a superior's "snide remarks and threats, such as
'your number's up' and 'don't forget who got you where you are,"
ruling that they would not "deter reasonable employees from
complaining about Title VII violations") (further internal
quotation marks omitted), amended, 433 F.3d 672 (9th Cir. 2005).

At oral argument, Slater emphasized that her retaliation
theory was based more on what Kane said than on how he said it,
in particular, his threat to subject her to "nitpicking."  The
court agrees that a threat, depending on its severity, could
constitute retaliation in the sense that "it well might have
dissuaded a reasonable worker from making or supporting a charge
of discrimination," Burlington Northern, 548 U.S. at 67.  See,
e.g., EEOC v. Creative Networks, LLC, No. 05-3032, 2009 WL
597214, at *6 (D. Ariz. Mar. 9, 2009); Martin v. Gates, No. 07-

513, 2008 WL 4657807, at *5 (D. Haw. Oct. 20, 2008); Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006).[13]

A threat to subject an employee to heightened scrutiny would not have that deterrent effect, however, because heightened scrutiny is not itself an adverse employment action sufficient to show retaliation.  See, e.g., Billings, 515 F.3d at 54; Hernandez-Torres, 158 F.3d at 47; see also Novack, 2007 WL 842152, at *3 (ruling that plaintiff could not establish retaliation based on a threatened transfer because the transfer would not have been an adverse action anyway).  In contrast, threats that have been found sufficiently adverse to support retaliation claims include "I could fire you right now," Creative Networks, 2009 WL 597214, at *6, or "a combination of threats and actions taken with the design of imposing both economic and psychological harm," Williams v. W.D. Sports, N.M., Inc., 497

_____

[13]There is substantial authority--some of it post-dating Burlington Northern--that a threat cannot amount to an adverse employment action unless the threat is carried out.  See, e.g., Dick v. Phone Directories Co., 397 F.3d 1256, 1258 (10th Cir. 2005); Novack v. Principi, No. 04-40, 2007 WL 842152, at *3 (N.D. Fla. Mar. 19, 2007); Davis v. Emery Worldwide Corp., 267 F. Supp. 2d 109, 124 (D. Me. 2003); Helgeson v. Am. Int'l Group, Inc., 44 F. Supp. 2d 1091, 1098 (S.D. Cal. 1999); Chisholm v. Foothill Capital Corp., 3 F. Supp. 2d 925, 937-38 & n.5 (N.D. Ill. 1998). This court need not decide whether to adopt such a broad rule here, but notes that its blanket nature appears to be inconsistent with Burlington Northern's teaching that "the significance of any given act of retaliation will often depend upon the particular circumstances."  548 U.S. at 69.

F.3d 1079, 1090 (10th Cir. 2007) (threats to spread false rumors about the employee's sexual activity and ruin her marriage, coupled with opposition to the plaintiff's claim for unemployment benefits based on a false charge of sexual harassment).[14]

This is not to suggest that a threat does not rise to the level of retaliation unless it is explicitly directed at the plaintiff's continued employment. Taken as a whole, however, Chief Kane's comments to Slater do not approach the standard for retaliatory adverse action. Again, Kane concluded his comments by offering to cease the very practice that Slater had challenged, albeit in two months instead of immediately. It is difficult to see how an employer "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" through an exchange that, while no doubt

---

[14]The same is true of threatening an employee with firing if she persists with the protected activity. See, e.g., Beckel v. Wal-Mart Assocs., Inc., 301 F.3d 621, 624 (7th Cir. 2002). But that is not Slater's theory here. She argues that, as a result of her protected activity, she "had crossed the line with" Kane, who was determined to fire her or force her to quit--as opposed to giving her an ultimatum to stop complaining or be fired. The court repeatedly pressed Slater's counsel on this point at oral argument, and counsel stated without equivocation that Slater believed to a certainty that her confrontation with the Chief manifested his decision to terminate her, as opposed to threaten her termination if she persisted with her workplace complaints in the future.

unpleasant, concluded in an agreement that the employee would soon be free of the alleged discrimination.

To be sure, few employees, particularly those new to the job or career, would look forward to a showdown with a supervisor like the one Slater recounts, but "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Burlington Northern, 548 U.S. at 68.  And the fact is that a boss's yelling at an employee, subjecting the employee to unjustifiable criticism, and calling into question his or her future on the job is a common employee experience.[15]  Furthermore, there is ample evidence that Slater found the encounter personally upsetting, but the Supreme Court has instructed that, for retaliation claims, the "standard for judging harm must be objective," not based on a plaintiff's "subjective feelings."  Id. at 68-69. Slater cannot show retaliatory conduct as a matter of law.[16]

_____

[15]Indeed, this scene has been captured in popular fiction ranging from James Joyce's Dubliners (the "Counterparts" story") to Scott Adams's Dilbert.

[16]The cases on which Slater relies in support of her retaliation claim, like those on which she relies in support of her constructive discharge claim, are distinguishable in ways that make them inapposite.  See Thomas v. Tex. Dep't of Crim. Justice, 220 F.3d 389, 394 (5th Cir. 2000) (upholding plaintiff's verdict on retaliation claim based on failure to promote or

**D.    The remaining claims**

Finally, because Slater was not fired, but quit--and because she cannot show that she was forced to quit by way of a constructive discharge--she cannot prevail on any of her remaining claims that do not arise out of employment law, namely, those alleging violations of her constitutional right to procedural due process and common-law breach of contract and intentional interference with contractual relations.

By the Town's own admission, Slater had a constitutionally protected property interest in her continued employment that would have entitled her to procedural due process, but she

_____

transfer); Howard v. Bd. of Educ., 876 F. Supp. 959, 973 (N.D. Ill. 1995) (ruling that allegations that principal responded to teacher's sexual harassment complaint by telling her "to let the harassment continue or heads would roll," and that she was constructively discharged, while "a bit thin, even under the federal notice pleading standards, . . . minimally allege a prima facie case of retaliation").

Two of those cases, including one from the court of appeals, recognize a theory of retaliatory harassment, see Noviello v. City of Boston, 398 F.3d 76, 89-94 (1st Cir. 2005); Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 965 (9th Cir. 2004), which Slater appears to disclaim in her objection to the summary judgment motion.  In any event, to prove retaliatory harassment, a plaintiff must prove conduct that would amount to a hostile work environment, i.e., "severe or pervasive harassment that materially altered the conditions of her employment" as opposed to "the ordinary, if occasionally unpleasant, vicissitudes of the workplace."  Noviello, 398 F.3d at 92.  Slater's single unpleasant encounter with Kane does not fit the bill.  See Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83-84 (1st Cir. 2006).

voluntarily gave up those rights when she resigned.  She

therefore cannot maintain a procedural due process claim.  See

Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 53 (1st Cir.

2005).  By the same reasoning, the Town did not breach Slater's

employment contract by "terminating" her without cause because

she was not terminated, either actually or constructively.  See

Karch v. BayBank FSB, 147 N.H. 525, 536 (2002).

        Nor can Slater prevail on her claim of intentional

interference with contractual or economic relations against Kane,

which requires her to prove, inter alia, that the allegedly

improper interference caused her damages.  See Singer Asset Fin.

Co. v. Wyner, 156 N.H. 468, 478 (2007).  The only damages Slater

claims from Kane's alleged interference with her purported

contract with the Town are her "constructive discharge and the

termination of her employment," but, again, she cannot prove

constructive discharge as a matter of law, so the loss of her job

was her own doing, not Kane's.  Slater acknowledged at oral

argument, in fact, that her intentional interference claim was

dependent on her constructive discharge theory.  The defendants

are entitled to summary judgment on all of Slater's claims.

31

## IV.   Conclusion

Even when Slater's version of her confrontation with Chief Kane is accepted as true, that confrontation, though no doubt intimidating to a new lawyer in her position, is simply not tantamount to employment discrimination or retaliation.  As the court of appeals has instructed, "a supervisor's unprofessional managerial approach and accompanying efforts to assert [his] authority are not the focus of the discrimination laws."  Lee-Crespo, 354 F.3d at 46.  Accordingly, the defendants' motion for summary judgment (document no. 13) is GRANTED because Slater has not demonstrated a genuine issue of fact as to whether she was constructively discharged or otherwise suffered an adverse employment action.  All other pending motions are DENIED as moot. The clerk shall enter judgment accordingly and close the case.


        SO ORDERED.

                                   _____
                                   Joseph N. Laplante
                                   United States District Judge

Dated:  March 20, 2009

cc:  Craig L. Staples, Esq.
     Elaine M. Michaud, Esq.
     Donald L. Smith, Esq.
     Charles P. Bauer, Esq.